3 A.3d 1279 (2010)
416 N.J. Super. 334
ARTHUR ANDERSEN LLP, Plaintiff-Appellant,
v.
FEDERAL INSURANCE COMPANY, Defendant, and
Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies, Defendants-Respondents.
Nos. A-2155-08T1
Superior Court of New Jersey, Appellate Division.
Argued March 3, 2010.
Decided September 30, 2010.
*1281 Stephan G. Weil (Dickstein Shapiro LLP) of the Washington bar, admitted pro hac vice, argued the cause for appellant (Greenberg Traurig LLP and Mr. Weil, attorneys; David Jay, Alexander J. Anglim, Florham Park, and Mr. Weil, on the brief).
Catherine Mondell (Ropes and Gray LLP) of the Massachusetts bar, admitted pro hac vice, argued the cause for respondents (Duane Morris LLP and Ms. Mondell, attorneys; Gregory R. Haworth, Newark, on the brief).
Before Judges FISHER, SAPP-PETERSON and ESPINOSA.
The opinion of the court was delivered by
ESPINOSA, J.A.D.
Plaintiff, Arthur Andersen LLP (Andersen), alleged that business losses caused as a result of property damage to the World Trade Center (WTC) and the Pentagon on September 11, 2001 were covered losses under its insurance policy. Andersen appeals from orders that granted summary judgment to the insurer, dismissing its claims. We affirm.
Andersen contends that it earned $204 million less than it expected to earn in the three and one-half months following the terrorist attacks. Andersen did not own or lease any property at the WTC or the Pentagon and cannot identify any supplier or client whose property was damaged to support this claim. Nonetheless, Andersen filed a claim under its all-risk commercial property insurance policy for business losses that it claims it suffered as a result *1282 of the property damage to the WTC and the Pentagon, based upon a comparison between expected revenue trends and actual revenue earned. This lawsuit ensued when coverage was denied by Federal Insurance Company (Federal) and Certain Underwriters at Lloyd's and Certain London Market Insurance Companies (London), (collectively, defendant insurers).
Andersen had a three layer program of commercial property insurance covering the period from September 1, 2001 through September 1, 2002. The primary layer of $5 million was purchased from Federal (the Policy). London provided the next $20 million in excess coverage in a "follow-form" policy that followed the terms of the primary Federal policy. The second excess layer of $275 million was provided by Federal as well. The Policy was an all-risk policy that covers all perils unless expressly excluded and there is no contention that any of the specified exclusions applies.
Andersen had a retention of $250,000 for each policy and settled its dispute with Federal as to the primary layer and the second excess layer of coverage, resulting in the dismissal of the claims against Federal in August 2006. It is undisputed that the attachment point for London's coverage was $5,250,000 in losses. See Carpenter Tech. Corp. v. Admiral Ins. Co., 172 N.J. 504, 518, 520, 800 A.2d 54 (2002) (settlement with a primary insurer exhausts the primary coverage).
Andersen contends that coverage for its claim is provided by the Contingent Business Interruption (CBI) provision, Clause 9.F(4)(b), and the Interdependency provision, Clause 9.F(6). Both these provisions are within the "Time Element Coverages" (Clause 9.F), which apply when a specified type of loss for a period of time of up to eighteen months is caused by damage to specified property.
The CBI provision gives the insured coverage for the loss of sales or revenue sustained when its business is interrupted as a result of damage to property that disrupts the flow of goods and services with a supplier or customer and states, in pertinent part:
This policy ... is extended to cover the actual loss sustained by the Insured resulting from the necessary interruption of the business conducted by the Insured, whether partial or total, caused by loss, damage or destruction covered herein ... to:

. . .
Property that directly or indirectly prevents a supplier of goods, services or information to the Insured from rendering their goods, services, or information or property that directly or indirectly prevents a receiver of goods, services or information from the Insured from accepting or receiving the Insured's goods, services or information.

[Clause 9.F(4)(b) (Emphasis added).]
When an insured sustains losses at one insured location as a result of property damage at another insured location, the Interdependency provision provides coverage as follows:
This policy is extended to cover the total loss sustained by the Insured anywhere in the world caused by loss, damage or destruction by any of the perils covered herein during the term of this policy to any real or personal property as described in Clause 9 situated within the Territory covered by this policy.
[Clause 9.F(6) (Emphasis added).]
Andersen contends that its claim is covered under the Interdependency provision because the WTC, the Pentagon, and United Airlines Boeing 757 Aircraft (Flight 93) fall within the following definition of Real and Personal Property contained in Clause 9.A(1):

*1283 The interest of the Insured in all real and personal property ... which is not otherwise excluded and which is owned, used, leased or intended for use by the Insured, or in which the Insured may have an insurable interest, or for which the Insured may be responsible for the insurance....
[(Emphasis added).]
No evidence has been presented that Andersen insured or was responsible for insurance for either site or the airplane. As previously mentioned, Andersen did not own or lease any of this property.
In interrogatory answers, Andersen further stated that its claim of approximately $204 million in lost revenues was "based on a comparison between expected revenue trends and actual revenue earned" and could not be separated to correspond to the damage to the different properties, i.e., the WTC, the Pentagon or the United Airlines airplane. Andersen maintained that its claim was "not based on a client-by-client calculation" but rather, based upon a comparison between expected revenue trends and actual revenue earned (the generalized revenue shortfall). Some of Andersen's proposed witnesses acknowledged that various factors affected its revenues after September 11, including disruption of air traffic, governmental action to reduce the risk of future attacks, the general fear of future attacks, the economic downturn, Andersen's involvement in the Enron scandal and the choice by some potential clients to take their business to Andersen's competitors.
Motion practice was extensive. The orders appealed from are:

1. February 18, 2005 order denying Andersen's motion for partial summary judgment.

In December 2004, Andersen filed a motion for partial summary judgment, seeking declarations "that the insurance policies at issue cover business interruption losses flowing from damage to any real and personal property in which Andersen 'may have an insurable interest' and that Andersen has an insurable interest in the World Trade Center." Defendant insurers filed a cross-motion for partial summary judgment seeking a declaration that Andersen "has no insurable interest in the World Trade Center and is not entitled to coverage under the business interruption provisions of the policies at issue." The court denied both the motion and cross-motion by order dated February 23, 2005. Andersen appeals from this order, alleging that it was error for the court to conclude that "insurable interest" is ambiguous.

2. January 9, 2006 order denying Andersen's motion for partial summary judgment.

In October 2005, Andersen filed a motion for partial summary judgment seeking a declaration "that the Interdependency Clause in the policies provides coverage for any and all losses Andersen sustained as a result of the destruction of property described in any portion of Clause 9 of the Primary Policy." By order dated January 9, 2006, the court denied the motion.

3. September 15, 2006 order denying Andersen's motion for partial summary judgment.

Among several motions filed by Andersen and London in May 2006, Andersen filed a motion for partial summary judgment and London filed a cross-motion as to the number of occurrences under the Policy. London's cross-motion was withdrawn and Andersen's motion was denied by order dated September 15, 2006. Andersen appeals from the September 15, 2006 order that reflected a ruling that "occurrence" is ambiguous.

*1284 4. February 21, 2008 order granting partial summary judgment to London.

The court granted partial summary judgment to London, finding as a matter of law that the WTC and Pentagon are not covered by the policy's insurable interest and total loss provisions and that Andersen could not present a trend-based calculation of the entire loss it suffered immediately after September 11.

5. June 5, 2008 order granting partial summary judgment to London.

London filed a motion, dated February 29, 2008, seeking partial summary judgment regarding "whether Andersen can present a generalized revenue shortfall claim under the Contingent Business Interruption provision and limiting the claim that Andersen presents under the Contingent Business Interruption provision to at mostthose 23 clients and potential clients it has identified in its discovery responses and the $18.3 million in lost revenue it alleges is attributable to those clients and potential clients."[1] Andersen filed a cross-motion for partial summary judgment.
Simply put, Andersen's position was that the September 11 attacks caused property damage; that there was a resulting economic downturn and that Andersen's lost revenue thereafter was therefore caused by the property damage on September 11. The insurers argued that Andersen's claim based upon the generalized revenue shortfall claim should be dismissed because Andersen was unable to satisfy four specific requirements for the application of the CBI provision to that claim, i.e., Andersen was unable to show: (1) partial or total cessation of Andersen's business, (2) an identified receiver of Andersen's services, (3) that a receiver of Andersen's services was prevented, directly or indirectly, from receiving Andersen's services, and (4) that the loss was the result of damage to property. In granting partial summary judgment, the trial court stated that, even with proposed expert testimony as described by its counsel, Andersen would be unable to satisfy the fourth prerequisite to a CBI claim:
[W]ith respect to the generalized revenue shortfall theory, it is not the actual physical destruction of the World Trade Center that Andersen is saying caused the generalized revenue shortfall.
And also in the context of that argument, what I believe Andersen overlooks constantly in their brief is the word caused. The property damage has to cause the loss. That's, specifically, stated in the CBI provision. The CBI provision, paraphrasing it, says, the loss caused by the damage to the property.
Under the most expansive reading that I can give to Andersen's arguments in this case, they are not alleging that on the generalized revenue ... shortfall theory, that the property damage, itself, caused the loss. Andersen is really arguing that the event, the terroristic event caused the loss.
And I think that is highlighted in my mind by some of the responses that I received to my hypothetical questions. One being that [if] low income housing was destroyed [in a terrorist attack] and Andersen arguing that the destruction of low income housing, because that was damaged property, would cause them a loss. Well, obviously, the property damage in that case caused them no loss, it's the terroristic event that causes the loss.
*1285 The trial court also found that the Interdependency provision did not provide coverage for this claim. By orders dated June 5, 2008, the court granted London's motion for partial summary judgment and denied Andersen's cross-motion.

6. November 17, 2008 order granting summary judgment to London.

The parties entered into a stipulation that Andersen could not prove more than $5,250,000 in covered losses, the attachment point for London's coverage, under the claims that remained after the court's earlier rulings. The court granted London's motion for summary judgment, dismissing all outstanding claims and finding as a matter of law that, in light of the stipulation, there was no liability under the London policy.
In this appeal, Andersen presents the following issues for our consideration:
POINT I
THE TRIAL COURT ERRED BY RULING ON SUMMARY JUDGMENT THAT ANDERSEN'S LOSSES WERE NOT CAUSED BY THE DAMAGE TO THE WTC AND THE PENTAGON ON 9/11.
1. THE TRIAL COURT ACKNOWLEDGED THE EXTENSIVE TESTIMONY THAT THE CBI PROVISION WAS INTENDED TO BE AS BROAD AS POSSIBLE.
2. THE TRIAL COURT MISCHARACTERIZED ANDERSEN'S CLAIM AS ONE FOR LOSSES PROXIMATELY CAUSED BY THE TERRORIST EVENT, NOT THE RESULTING PROPERTY DAMAGE.
3. CAUSATION IS A QUESTION OF FACT.
4. ANDERSEN SHOULD HAVE BEEN ALLOWED TO PRESENT EXPERT TESTIMONY THAT PROPERTY DAMAGE WAS A PROXIMATE CAUSE OF ANDERSEN'S LOSSES.
POINT II
THE TRIAL COURT ERRED IN RULING THAT ANDERSEN MAY NOT PRESENT EVIDENCE OF ITS TOTAL LOSS RESULTING FROM DAMAGE TO THE WTC AND THE PENTAGON.
1. THE COURT'S RULINGS ON THE POLICY'S INSURABLE INTEREST AND TOTAL LOSS PROVISIONS.
2. THE POLICY LANGUAGE COVERS PROPERTY WHOSE LOSS WOULD CAUSE ANDERSEN ECONOMIC HARM.
A. THE POLICY LANGUAGE IS CLEAR AND UNAMBIGUOUS.
B. AN INSURABLE INTEREST IS ANY RELATIONSHIP TO PROPERTY SUCH THAT DAMAGE TO THE PROPERTY CAUSES ECONOMIC HARM.
C. INSURABILITY CAN BE DETERMINED RETROSPECTIVELY.
D. THE TRIAL COURT IMPROPERLY REQUIRED ANDERSEN TO PRESENT EXTRINSIC EVIDENCE PROVING THE MEANING OF UNAMBIGUOUS TERMS.
E. ANDERSEN PRESENTED EVIDENCE OF ITS EXPECTATION OF COVERAGE FOR LOSS CAUSED BY DAMAGE TO ANY PROPERTY.
F. THE TRIAL COURT IMPROPERLY REVERSED THE BURDEN OF PROOF.
G. THE JURY SHOULD BE PERMITTED TO CONSIDER EVIDENCE OF ANDERSEN'S OVERALL INCOME SHORTFALL.

*1286 3. THE TRIAL COURT ERRED IN RULING THAT THE POLICY LANGUAGE DEFINING THE NUMBER OF OCCURRENCES IS AMBIGUOUS.
At the heart of Andersen's arguments is the legal question whether Andersen's claim falls within the coverage provided by the CBI provision or the Interdependency provision. After carefully reviewing the record, briefs and arguments of counsel, we are satisfied that there is no merit to plaintiff's claim that its losses are covered by the CBI or Interdependency provisions of the Policy and that, as a result, we need not address the argument in Point II(3) regarding the number of occurrences.
When reviewing a grant of summary judgment, we employ the same standards used by the trial court, which permits summary judgment if the record shows that "there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995); Burnett v. Gloucester County Bd. of Chosen Freeholders, 409 N.J.Super. 219, 228, 976 A.2d 444 (App.Div.2009); Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). The interpretation of an insurance contract is an issue of law which we review de novo, with no special deference to the trial court's interpretation of the law and the legal consequences that flow from the established facts. Zabilowicz v. Kelsey, 200 N.J. 507, 512-13, 984 A.2d 872 (2009); Homesite Insur. Co. v. Hindman, 413 N.J.Super. 41, 47, 992 A.2d 804 (App.Div. 2010).
We interpret the language of an insurance policy by giving its words "their plain, ordinary meaning." Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595, 775 A.2d 1262 (2001). See also Pizzullo v. New Jersey Mfrs. Ins. Co., 196 N.J. 251, 270, 952 A.2d 1077 (2008); Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175, 607 A.2d 1255 (1992); Longobardi v. Chubb Ins. Co., 121 N.J. 530, 537, 582 A.2d 1257 (1990). Where the express language of the policy is clear and unambiguous, it will be "enforced as written." Flomerfelt v. Cardiello, 202 N.J. 432, 441, 997 A.2d 991 (2010); Royal Ins. Co. v. Rutgers Cas. Ins. Co., 271 N.J.Super. 409, 416, 638 A.2d 924 (App.Div.1994). See Gibson v. Callaghan, 158 N.J. 662, 670, 730 A.2d 1278 (1999) (Courts "should not write for the insured a better policy of insurance than the one purchased.") (citation omitted); Longobardi, supra, 121 N.J. at 537, 582 A.2d 1257 ("[A] court should not engage in a strained construction" in order to find coverage.). If the terms are not clear, but instead are ambiguous, we interpret the contract in accordance with the "reasonable expectations" of the insured. Shotmeyer v. New Jersey Realty Title Ins. Co., 195 N.J. 72, 82, 948 A.2d 600 (2008); Proformance Ins. Co. v. Jones, 185 N.J. 406, 415, 887 A.2d 146 (2005); Zacarias, supra, 168 N.J. at 595, 775 A.2d 1262.
"[O]nly genuine interpretational difficulties will implicate the doctrine that requires ambiguities to be construed favorably to the insured." Progressive Cas. Ins. Co. v. Hurley, 166 N.J. 260, 273-74, 765 A.2d 195 (2001). A "genuine ambiguity" arises only "where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." Ibid. (quoting Weedo v. Stone-E-Brick, Inc., 81 N.J. at 233, 247, 405 A.2d 788 (1979)). For example, if the "policy language supports two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied." Lundy v. Aetna Cas. & Sur. Co., 92 N.J. 550, 559, 458 A.2d 106 (1983). However, our Supreme *1287 Court has cautioned that "courts must guard against rewriting policies in favor of the insured under the guise of interpreting a contract's reasonable terms." Shotmeyer, supra, 195 N.J. at 82-83, 948 A.2d 600. Even in cases where ambiguities exist, "courts cannot `write for the insured a better policy of insurance than the one purchased.'" Flomerfelt, supra, 202 N.J. at 441, 997 A.2d 991 (quoting Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 116 N.J. 517, 529, 562 A.2d 208 (1989)). These principles are designed to protect insureds from "technical encumbrances" and "hidden pitfalls" in their insurance contracts while also providing insurers with "predictable levels of risk... in order to calculate premium rates reliably." Shotmeyer, supra, 195 N.J. at 83, 948 A.2d 600.
Significantly, Andersen does not contend that it is entitled to coverage due to any ambiguity in the terms of the Policy provisions at issue here. We agree that the language of the CBI and Interdependency provisions is clear and unambiguous, and therefore, must be enforced as written. See Flomerfelt, supra, 202 N.J. at 441, 997 A.2d 991.
As the party seeking coverage, Andersen bears the burden of bringing its claim within the basic terms of the insurance policy. Hartford Accident & Indem. Co. v. Aetna Life & Cas. Ins. Co., 98 N.J. 18, 26, 483 A.2d 402 (1984). A threshold requirement for the application of each of the policy provisions relied upon by Andersen is damage to a specified category of property. When the language of the Policy is applied to the facts here, it is clear that Andersen is unable to meet that threshold requirement for either the CBI or the Interdependency provisions of the Policy.

I
The pertinent language of the CBI clause provides coverage for
the actual loss sustained by the Insured resulting from the necessary interruption of the business conducted by the Insured, ... caused by ... damage ... to:
Property that directly or indirectly prevents a supplier of goods, services or information to the Insured from rendering their goods, services or information or property that directly or indirectly prevents a receiver of goods, services or information from the Insured from accepting or receiving the Insured's goods, services or information.
In other words, the covered loss is caused by property damage that prevented the flow of goods or services to or from the insured and necessarily interrupted the insured's business. This is consistent with the explanation of CBI coverage given by Michael Alford, who was responsible for procuring the Federal policies at issue for Andersen, as providing "coverage for loss of sales, revenue, from either a client or a supplier." He stated further that the coverage is triggered by a physical loss at a supplier's or a customer's location.
It is evident that Andersen cannot satisfy its burden to bring its claim within this provision by merely showing a decline in income coupled with property damage that does not meet the criteria clearly and unambiguously established by the CBI clause. Andersen argues that, within the context of a summary judgment motion, such proof, along with anticipated expert testimony, created an issue of fact regarding causation that must be left for a jury's determination.[2] Contrary to Andersen's *1288 argument, a trial court is not foreclosed from granting summary judgment on the issue of causation. The question is whether Andersen has presented sufficient competent, credible evidence to create a genuine issue of fact that the losses claimed were caused by the property damage here. See Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 302-03, 788 A.2d 268 (2002); James v. Bessemer Processing Co., 155 N.J. 279, 305-07, 714 A.2d 898 (1998). As noted in cases involving the 1993 attack upon the WTC and the Oklahoma City bombing, while causation is generally a question of fact, "the question becomes an issue of law when there is no evidence from which a jury could reasonably find the required proximate, causal nexus between the careless act and the resulting injuries." Port Auth. v. Arcadian Corp., 189 F.3d 305, 318-319 (3d Cir.1999) (quoting Gaines-Tabb v. ICI Explosives, USA, Inc., 160 F.3d 613, 620 (10th Cir.1998)).
To survive summary judgment, it was necessary for Andersen to present evidence that would allow a factfinder to find the claimed business loss was caused by damage to property that "directly or indirectly prevent[ed]" a client from accepting or receiving Andersen's services. However, as to the $204 million claim that is the subject of this appeal, Andersen has neither identified any interruption of its business nor any customer who was unable to receive services as a result of property damage to the WTC or Pentagon. Andersen's argument that such prerequisites to coverage should be inferred from its generalized revenue shortfall is a rather transparent attempt to skirt criteria for coverage that it cannot satisfy. In the absence of competent, credible evidence that the losses were caused by damage to property that prevented the flow of goods or services, resulting in the interruption of Andersen's business, Andersen has failed to show the existence of a genuine issue of fact that precluded summary judgment.

II
The pertinent language of the Interdependency clause provides coverage for "the total loss sustained by the Insured anywhere in the world caused by ... damage... to any real or personal property as described in Clause 9[,]" i.e., property "in which the Insured may have an insurable interest...." Andersen argues that its claim falls within that definition because it had an insurable interest in the WTC and the Pentagon.[3]
One must have an insurable interest in property to sustain recovery under a policy that insures risks for property damage. Shotmeyer, supra, 195 N.J. at 85-87, 948 A.2d 600; Miller v. New Jersey Ins. Underwriting Ass'n., 82 N.J. 594, 600, 414 A.2d 1322 (1980); Balentine v. New Jersey Ins. Underwriting Ass'n, 406 N.J.Super. 137, 141-42, 966 A.2d 1098 (App.Div. 2009). The purpose for this requirement is "the discouragement of illicit uses of insurance, such as wagering, and the destruction of insured property." Miller, supra, 82 N.J. at 601, 414 A.2d 1322. See also Grigsby v. Russell, 222 U.S. 149, 154-55, 32 S.Ct. 58, 56 L.Ed. 133, 136 (1911); Lincoln Nat'l Life Ins. Co. v. Calhoun, 596 F.Supp.2d 882, 889 (D.N.J.2009) ("Without an insurable interest, there would be no actual loss; the contract would thus be a pure gamble.") (citation omitted); Hyman v. Sun Ins. Co., 70 N.J.Super. 96, 99, 175 A.2d 247 (App.Div.1961).
Although it is not necessary to have legal or equitable title to have an *1289 insurable interest in real estate, it is clear that the interest in the property must have some pecuniary value and that the party who seeks to recover bears the burden of proving that value. See Miller, supra, 82 N.J. at 602-03, 414 A.2d 1322; P.R. DeBellis Enter. v. Lumbermen's Mutual Cas. Co., 77 N.J. 428, 438, 390 A.2d 1171 (1978). The test of an insurable interest in real property is "whether the insured has such a right, title or interest therein, or relation thereto, that he will be benefited by its preservation and continued existence or suffer a direct pecuniary loss from its destruction or injury by the peril insured against." Balentine, supra, 406 N.J.Super. at 141-42, 966 A.2d 1098 (quoting Hyman, supra, 70 N.J.Super. at 100, 175 A.2d 247) (emphasis added). See also 33-195 Appleman on Insurance § 195.01 (2d ed. 2008) ("The usual rule customarily followed is that an insurable interest exists when the insured derives pecuniary benefit or advantage by the preservation or continued existence of the property or will sustain pecuniary loss from its destruction.").
Andersen did not derive any direct pecuniary benefit, such as rental income, from the existence of the WTC and Pentagon and suffered no direct loss from the damage inflicted to those buildings on September 11. Andersen argues that such proof is unnecessary; that an insurable interest means "any economic interest in the continued existence of the property" and exists "if the loss of the property may cause the insured an economic loss." (Emphasis added). When the trial court explored the breadth of this contention with counsel at oral argument, Andersen's counsel agreed that, based upon its interpretation, Andersen could assert a claim for lost revenue if a terrorist attack targeted and destroyed property that was completely unrelated to Andersen's ability to conduct its business, i.e., low income housing in New York. This expansive interpretation fails because it conflicts with established caselaw and subverts the policy underlying the insurable interest requirement.
The common thread in cases in which an insurable interest is found is the existence of a cognizable relationship between the insured and the property that provides the basis for the insured to derive a direct pecuniary benefit from the property or suffer a direct pecuniary loss if the property is damaged. For example, in Balentine, supra, a nominal owner of property had a sufficient nexus to the property to create an insurable interest because of his potential liabilitiesfor unpaid real estate taxes or to a visitor injured on the premises. We noted that, "in the absence of insurance coverage, [the named insured] would `suffer a direct pecuniary loss from [the property's] destruction.'" 406 N.J.Super. at 144, 966 A.2d 1098. See also Miller, supra, 82 N.J. at 594, 414 A.2d 1322 (mortgagees who operated businesses from the insured property continued to have insurable interests after the city had obtained title to the property through foreclosure proceedings for nonpayment of real estate taxes); Hyman, supra, 70 N.J.Super. at 100, 175 A.2d 247, and cases cited therein. In contrast to these cases, Andersen is unable to identify any relationship it had with either the WTC or the Pentagon that had an ascertainable value and provided a basis for pecuniary benefit or loss.[4]
*1290 In Shotmeyer, our Supreme Court rejected the argument that an insurable interest existed where there was a far closer relationship between the insured and a loss caused by a defect in title. The title insurance policy was issued when two brothers purchased property as partners trading as a general partnership. The policy defined "insured" as those named and those who succeeded to their interest by operation of law. The policy also provided for the continuation of insurance after title was conveyed "so long as such insured retains an estate or interest in the land... or so long as such insured shall have liability by reason of covenants of warranty made by such insured in any transfer or conveyance of such estate or interest...." Ten years later, the general partnership conveyed the property to a limited partnership in which the brothers were the sole limited partners and a corporation owned jointly and exclusively by them was the general partner. The limited partnership did not purchase a new title insurance policy for the property.
In an unpublished opinion, this court found that the brothers were entitled to coverage under the policy because they never transferred their "beneficial interests" in the land and the general and limited partnerships were "alter egos" of the brothers. Shotmeyer v. New Jersey Realty Title Ins. Co., No. A-2744-05, 2007 WL 283661 (App.Div. February 2, 2007). The Supreme Court rejected this analysis and reversed, finding that the brothers had no insurable interest in the property. The Court noted that, as a matter of law, a partnership is an entity distinct from its partners and that, as principals in the limited partnership, the brothers were shielded from personal liability. Shotmeyer, supra, 195 N.J. at 85-86, 948 A.2d 600. The Court recognized that one of the purposes underlying the principles of insurance contract interpretation is the insurer's need for "predictable levels of risk ... in order to calculate premium rates reliably" and concluded that allowing coverage to continue under the circumstances presented "effectively extends the time of exposure and the risk to the insurer." Id. at 83, 86, 948 A.2d 600.
The evidence here fails to show that Andersen derived any income, such as rent, from the existence of the WTC or that Andersen bore any potential liability to others based upon its "interest" in the WTC. In short, there are no circumstances of Andersen's association with the WTC that gave rise to the threat of a direct pecuniary loss to Andersen in the event the WTC was damaged.
Andersen's theory would permit an insured to allege an insurable interest in a class of property so broad as to be impossible to define and certainly not susceptible to a predictable level of risk. Just as an insurable interest cannot be viewed so narrowly as to create "a windfall for the insurer, allowing it to retain the premiums it reaped on [a] policy without providing anything in return," Balentine, supra, 406 N.J.Super. at 144, 966 A.2d 1098, the interest cannot be read as broadly as Andersen argues, allowing the insured to reap a windfall recovery for a loss so clearly unanticipated in the calculation of the premium. Such an application would undermine the very purpose of an "insurable interest" requirement, reducing an insurance contract to a "pure gamble," Lincoln Nat'l Life, supra, 596 F.Supp.2d at 889, and we reject it as a matter of law.
Affirmed.
NOTES
[1] In addition to the generalized revenue shortfall claim, Andersen submitted a claim under the CBI provision that was linked to twenty-three specific clients for a total of $18.3 million. That claim was not the subject of any motion relevant to this appeal.
[2] The right to a jury trial in a declaratory judgment action depends upon whether the relief sought is primarily legal or equitable in nature. In re Envtl. Ins. Declaratory Judgment Actions, 149 N.J. 278, 292, 693 A.2d 844 (1997).
[3] Because we find no ambiguity in the Policy language, it is unnecessary to explore the subjective understanding of the insured. However, we note that Alford testified that it would have been beyond his expectations for buildings such as the White House and the Pentagon to be covered as property in which Andersen had an insurable interest.
[4] Andersen's reliance upon Archer-Daniels-Midland Co. v. Phoenix Assur. Co., 936 F.Supp. 534, 543 (S.D.Ill.1996) to support an argument that a private entity may have an insurable interest in government property is misplaced. The issue of whether such an insurable interest existed was not before the court; the District Court merely concluded that the United States Coast Guard and the Army Corps of Engineers were suppliers of goods and services within the meaning of a CBI provision of the applicable insurance policies.