**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1189-23

MARCUS SANCHEZ, by his
guardians ad litem, MIGUEL
SANCHEZ and MARGEE
SANCHEZ,

      Plaintiff-Appellant,

v.

PUBLIC SERVICE ENTERPRISE
GROUP INC., PUBLIC SERVICE
ELECTRICITY AND GAS
COMPANY, a/k/a PSE&G, and
BOROUGH OF LODI,

      Defendants-Respondents,

and

MICHAEL MARINO, DOLORES
MARINO, COUNTY OF BERGEN,
and STATE OF NEW JERSEY,

      Defendants.

_____

Argued March 12, 2025 – Decided June 19, 2025

Before Judges Currier, Paganelli and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-6232-19.

Jean-Claude Labady argued the cause for appellant (Law Offices of Jeffrey S. Hasson, PC, attorneys; Jean-Claude Labady, of counsel and on the briefs).

Gregg A. Ilardi (Law Offices of Gregg A. Ilardi, LLC) argued the cause for respondent Borough of Lodi.

Anthony J. Corino argued the cause for respondent PSE&G (PSE&G Services Corporation, attorneys; Paige Nestel and Anthony J. Corino, on the brief).

PER CURIAM

Plaintiff Marcus Sanchez, by his Guardians Ad Litem, Miguel Sanchez and Margee Sanchez, appeals from the trial court orders of: October 13, 2023, granting defendant Public Service Electric and Gas Company (PSE&G) summary judgment; November 17, 2023, denying plaintiff's motion for reconsideration of the October order; and December 14, 2023, granting defendant Borough of Lodi (Lodi) summary judgment. Because the trial court's factual findings were adequately supported in the record, it did not misuse its discretion in making evidential decisions, and it correctly applied well-established law under the summary judgment standard, we affirm.

I.

We derive the facts and procedural history from the motion records. On the night of May 31, 2017, plaintiff was struck by a vehicle operated by defendant Michael Marino (Marino).[1] Marino was traveling along Prospect Street in Lodi and the accident occurred at the intersection of Central Avenue and Prospect Street. The parties dispute where—in the intersection's crosswalk or on the roadway—and what—skateboarding or walking—plaintiff was doing when he was struck. For purposes of our opinion, we accept plaintiff's contention that he was walking in the crosswalk.

Marino gave a recorded statement. He said that at the time of the accident, he was "not too sure" how fast he was traveling, but stated he "actually slow[ed] down [and] kep[t] it slow because of the stop sign."

Marino was deposed on April 1, 2021. Marino testified he "lived in Lodi for 63 years" and was "very familiar with Prospect Street before the accident." During his deposition the following exchange occurred:

> Q. . . . My question was, however, before, whether you were aware if there is a stop sign on Prospect Street at its intersection with Central Avenue?
>
> A. Yes.

---

[1] The State of New Jersey, Bergen County, Dolores Marino and Michael Marino are no longer in the case and did not participate in the appeal.

Further, Marino provided the following testimony:

> Q. I take it, sir, you had your headlights on, the headlights on your car?
>
> A. Yes.
>
> Q. And how was the visibility on Prospect Street before the accident from your headlights?
>
> A. Fine.
>
> . . . .
>
> Q. Could you see well on Prospect Street before the accident?
>
> A. Yes.
>
> Q. Do you know why you did not see [plaintiff] before the accident?
>
> A. No.

Peter Bavagnoli (Bavagnoli) lived in an apartment at the "corner of Prospect Street and Central Avenue" since 1988. On January 28, 2021, he gave a statement to plaintiff's investigator. The investigator's report stated:

> Bavagnoli recalled he had called PSE&G several times to report the overhead light is never on. Under questioning he offered that he called before the May 31, 2017 accident. He advised the light kept going out. The light had been a continuing problem and he had called several times. The light was repaired about a year ago and has been working properly since.

4

On March 8, 2021, Bavagnoli gave a recorded statement to the same investigator. The investigator's report recites the following exchange:

Q. We are standing here in front of your house. There is another traffic light. There is a utility light in front of the house.

A. Right.

Q. Has there been an issue with that light going on or off?

A. Not since I made a service call a few years back. I cannot confirm the date of that call but it was a necessary call. I felt the situation out here presented a lot of danger, mostly to my cars and also for people walking. Anybody could have got mugged right on the street. It was pitch black.

Q. This was when, though? Do you know anything about the dates?

A. I would say this must have happened, the call had to be placed right around the time of this accident. Was it prior to or after the date of the accident, I cannot confirm that. I don't know. I don't know what date I made that call.

Q. You're not certain then, okay.

A. I'm not certain of the date but the call was made.

Q. Who did you call?

A. P[SE&G].

Q. How about . . . Lodi?

A-1189-23

A.  I didn't call Lodi, no.  I saw a utility worker here.

Q.  When?

A.  When this was a problem.  I'm going to say, if I had to guess how many years ago I made this call, I'm going to have to say at least three years ago.  Three to four years ago.  I'm guessing.

Q.  When did you first notice it was out or when did you first see it out?

A.  Oh, probably three to four years ago.  It became a problem, it was never on.  But I'm guessing three to four years.

Q.  Was it a problem in 2017?

A.  I would have to say yes.

Q.  How about the winter or the spring?  Are you able to recall?

A.  I know when I did call it was warm weather.  It wasn't winter when I . . . made the call.  It's a very good possibility.  It may have been right in the window [of] three to four years, yeah.

Q.  I[] know I'm reaching into your memory, and I appreciate it.

A.  I have a great memory, but this is a tough one even for me.  I'm trying to get it just right.  Three to four years is the best I can say.  I'm guesstimating.

Q.  Do you think you called before the accident date?

6

A-1189-23

A. I wish I could say one way or the other in perfect candor, but I can't. I really can't confirm if it was before that date of '17, was it the 31st?

Q. 31st.

A. I don't know if it was before that date or after. . . .

. . . .

Q. . . . Do you remember it being out before the accident?

A. The light being out before the accident?

Q. Yeah, this overhead light that we are standing, right here.

A. I'm going to say four years ago that light was out. That's about as accurate as I can say. Four years ago there was a problem with that light.

Q. Do you remember, how many calls . . . you ma[d]e?

A. One call. It was rectified the next day.

. . . .

Q. Do you know of anybody else, any neighbors, who may have called about the light being out? Anybody else [in] the neighborhood?

A. My motivation was I feared for my cars.

. . . .

Q. This was when? You don't remember when this was?

7

A-1189-23

A. I'm going to say it had to be about four years ago. Four, four and a half years ago? In that neighborhood, four years, yeah.

. . . .

Q. It's been working now. As far back as you remember, in 2017 it had been a problem? It had been out, is that what you think?

A. Yeah. It would go on occasionally, but those occasions were few and far between.

On May 20, 2021, Bavagnoli was deposed. He testified regarding a streetlight located "about 20 yards [from] the intersection." He stated that he called PSE&G once "within the last four years," regarding the streetlight being "off more than it was on."

During the deposition, Bavagnoli was presented with a PSE&G job report from October 4, 2018. The report stated he had called PSE&G regarding the streetlight because the "light [wa]s out some nights and on others." Bavagnoli testified that he could not "dispute that" the October call was the one call he made to PSE&G. Bavagnoli explained the situation was corrected the next day. He also testified he "never spoke to anyone from . . . Lodi relative to the light."

PSE&G's and Lodi's responsibilities regarding the selection of streetlights in the Borough are governed by the Tariff.[2]  In part, the Tariff provides:

> Selection of Lighting Options:  P[SE&G] will assist in the selection of lighting options by making recommendations for the most appropriate option based on . . . [Lodi]'s defined illumination needs.  However, responsibility for the final selection shall, at all times, rest with . . . [Lodi].  Any advice given by P[SE&G] will be based on . . . [Lodi]'s statements and by giving such advice, P[SE&G] assumes no responsibility, nor shall it incur liability.

Plaintiff contended the intersection was insufficiently lit, either from the wrong lights being installed and/or tree limbs obstructing light to the intersection.  Plaintiff asserted those conditions prevented Marino from seeing the stop sign and plaintiff, and caused Marino to strike plaintiff.  Also, plaintiff contended tree limbs obstructed Marino's view of the stop sign causing him to strike plaintiff.  To support his theories, plaintiff produced expert opinions from Bryan Smith, P.E. (Smith) and Jeffrey Balan, P.E. (Balan).

Smith authored two reports, August 9, 2019, and December 23, 2021.  In the August report, Smith relied on the "International Property Maintenance Code

---

[2]  "A tariff is a published schedule of rates, filed by a public utility and, thereafter, 'applicable equally to all customers.'"  N.J. Bell Tel. Co. v. W. Orange, 188 N.J. Super. 455, 458 (App. Div. 1982) (quoting In re Saddle River Application, 71 N.J. 14, 29 (1976)).

(IPMC) 2012," which is published by the International Code Council (ICC).

According to Smith's report the IPMC is

> a model code that regulates the minimum maintenance requirements for existing buildings. It is a maintenance document intended to establish minimum maintenance standards for basic equipment . . . sanitation and fire safety. Responsibility is fixed among owners, operators and occupants for code compliance. The IPMC provides for the regulation and safe use of existing structures in the interest of the social and economic welfare of the community. This code is founded on principles intended to establish provisions consistent with the scope of a property maintenance code that adequately protects public health, safety and welfare.

Smith cited the following provision of the IPMC:

> § 101.2 Scope. The provisions of this code shall apply to all existing residential and nonresidential structures and all existing premises and constitute minimum requirements and standards for premises, structures, equipment and facilities for light, ventilation, space, heating, sanitation, protection from the elements, life safety, safety from fire and other hazards, and for safe and sanitary maintenance; the responsibility of owners, operators and occupants; the occupancy of existing structures and premises, and for administration, enforcement and penalties.

In addition, Smith's opinion relied on an "excerpt from [the Illuminating Engineering Society of North America] IESNA 2000." Using the IESNA, Smith

opined that the "level of illumination recommended for the subject incident location was 9 lux (0.9 foot[-]candles)." He stated

> the illuminance levels measured during the site inspection fairly replicated or were higher than that expected on the night of the subject incident.
>
> The illuminance level was measured and found to be 0.0 foot-candles at 8:45 [p.m.] on 5/23/18 at the incident location, even with the defective street[]light working in concert with the other streetlights.

According to Smith's analysis, "the illuminance level was measured to be 0.0 foot-candles at the incident location - even with all streetlights operational. This level was not sufficient for this location as recommended by the" IESNA. The "IESNA recommended an illuminance of 0.9 foot-candles."

Smith opined that "this was not the sole problem involved in the subject incident." He stated

> it was clear that with the non-operational streetlight, the only available non-vehicular lighting caused [plaintiff] to be illuminated only from behind - or "backlit" - from the driver's point of view. Therefore[,] the most likely reason that the driver did not see and thereby avoid striking [plaintiff] was the condition caused by the non-operational streetlight. This condition resulted in [plaintiff] being "backlit" by the only other streetlight present at the intersection. That being the case, the darkened appearance of [plaintiff] would have readily blended in with the other dark background items present in the area. It would have been easier for a driver to see and avoid a pedestrian with no streetlights

11

at all, when compared to those which resulted in backlit pedestrians. The vehicle's driver stated multiple times to the police that he didn't see what his vehicle ran over - he thought it had been a traffic cone. The police did not issue a citation to the driver, therefore the police did not believe that he had been at fault. However[,] with the knowledge that [plaintiff] had been legally within the crosswalk in front of a stop sign, the only plausible explanation for the incident was that the driver could not visually see [plaintiff] due to the lighting conditions. It was also likely that the backlighting condition worked to negate the illuminance afforded by the motor vehicle's own headlights.

Smith asserted that "PSE&G had been advised by local residents of the malfunctioning streetlight," and opined that "therefore [PSE&G] had adequate advance notice to rectify the situation." Further, Smith stated that Lodi "should have been on the watch for non-operational streetlights and then taken appropriate action to have them repaired." Smith opined that Lodi "should be on the watch for all potentially hazardous situations and conditions present within their jurisdiction. . . . Lodi failed to ensure the non-operational streetlight was repaired within a reasonable timeframe. Therefore . . . Lodi shared in the responsibility for the subject incident."

In addition, Smith opined that

Lodi was also responsible for the maintenance and trimming of all trees planted between the curb and the sidewalk. It was most likely that . . . Lodi chose the tree species and locations for all the trees around the

incident intersection. The tree closest to the stop sign facing the motor vehicle involved in the subject incident was essentially hiding the stop sign from the driver's view until the vehicle was approximately 10 feet away from it. While the speed limit was only 25 MPH on the [i]ncident street, the stopping distance at that speed and a normal reaction time would take a driver 85 feet to stop (see attached Brake/Stopping Distances table). Even if we assumed a zero reaction time for the driver, it would still take 30 feet to stop a car travel[]ing at 25 MPH. Therefore . . . Lodi shared responsibility for this incident due to their failure to locate the trees so that they would not obliterate drivers' view of important traffic signs ("stop" sign in this instance) and/or trim the trees so that their branches would not block the view of these signs.

In Smith's December 23, 2021, report he "offer[ed] the supplemental review comments" after reviewing various depositions and exhibits. Not included in the list of review items were the statements or deposition of Bavagnoli. Further, Smith stated "Marino admitted [in his deposition] that he was not aware of the stop sign at the incident intersection."

Smith stated:

I further believe that both . . . Lodi and PSE&G were negligent in that both parties likely had either actual or constructive knowledge of the streetlight . . . as being non-functional on the incident date. This was due to the mutual failure of both parties to take any measures whatsoever to routinely check on the functionality of the streetlights anywhere in Lodi. I believe that . . . Lodi's failures were palpably unreasonable because: 1) they were fully aware that the incident intersection was

13

dangerous (due to the signage they posted there before the incident occurred); 2) they failed to consult a qualified electrical engineer to determine necessary and proper illumination levels and equipment at the incident location; 3) they failed to trim the tree adjacent to the incident stop sign such that vehicle operators were aware of the need to stop there; 4) they failed to conduct any type of regular evaluations of streetlight functionality within their municipality whatsoever; and 5) they had no knowledge of their agreement with PSE&G with regard to their own responsibilities in selecting appropriate lamps, etc. and coverage. Even a simple twice a year lighting survey could be considered a minimal and necessary safety measure to ensure the safety of their residents. Lodi alleged that they did not know why the intersection was originally identified as being dangerous nor who removed the "dangerous" signs. Lodi's actions/inactions were palpably unreasonable. All of the opinions contained in my 8/9/19 report, as potentially modified above, remain unchanged. All of these conclusions were made to a reasonable degree of professional engineering certainty.

During Smith's deposition, when asked if "the [IPMC] applie[d] to municipalities," he responded "[n]o, not directly." Further, when asked whether "the [IPMC] applie[d] to lighting conditions on public roads," he responded "not directly, as far as the lighting provided." He acknowledged that he was "not an expert in illumination," but asserted he was qualified to offer opinions on backlighting because he was "an engineer trained in analyzing situations and

14

conditions." Nonetheless, he acknowledged, as to backlighting, he never: authored a report, was qualified as an expert, nor testified in court.

Moreover, Smith acknowledged that he could not "say PSE&G in any way violated that Tariff." Indeed, he acknowledged that he had "not reviewed the [T]ariffs in forming [his] opinion in this case." Nonetheless, Smith testified the Tariff was not the "single governing principle," instead, he thought "there [we]re other governing principles."

Balan issued three reports: August 9, 2019, December 22, 2021, and January 14, 2022. In preparing the August report, Balan reviewed Smith's report. Balan made the following findings:

> The IESNA 2000 illumination level is recommended to be 9 lux (approximately 0.9 foot[-]candles) for local roadways with an R2 or R3 classification. The measured illumination at the intersection on 5/23/18 at 8:45 [p.m.] was 0.0 foot[-]candles on the pavement surface with all light fixtures operational.
>
> The light fixture on Prospect Street located south of the intersection was not operational at the time of the incident causing loss of illumination in the general area of the intersection as well as the approach to the intersection in the direction the vehicle was traveling.
>
> Un-trimmed tree branches obscured the stop sign at the intersection from the traveling vehicles vantage point. A vehicle would need to be approximately 10 feet from the painted stop line in order to visibly see the stop sign.

15

The streetlight is owned and operated by PSE&G and was reported out several times months prior to the incident.

According to Balan's analysis:

Based on the illumination measurements taken a year after the incident, the intersection did not have sufficient lighting to meet the recommended illumination levels noted in [the] IESNA handbook. Although this does not mean an absence of light at the intersection, the levels were well below that of normally accepted practices.

The un-trimmed tree at the intersection obscured the visibility of the stop sign until it was too late to stop. The posted speed limit at the intersection is 25[ ]MPH. Based on this speed, it would take approximately 85 feet to stop allowing for human reaction time. Taking the human reaction time out, it would still take 30 feet to stop a vehicle at that speed. Based on [Smith]'s [r]eport, the stop sign was only visible within 10 feet of the intersection, shorter than the stopping distance of the vehicle. Based on the New Jersey DOT[3] Design Guide Manual:

6.3.1 There must be unobstructed sight along both roads at an intersection and across their included corner for distances sufficient to allow operators of vehicles approaching the intersection or stopped at the intersection to observe pedestrians and cyclists and carry out whatever maneuvers may be required to negotiate the intersection. It is of equal importance that

---

[3] New Jersey Department of Transportation.

pedestrians be able to view and react to potential conflicts with vehicles.

The only streetlight at the intersection in operation was located behind [plaintiff] as he walked across the crosswalk. This would create a back-lighting effect which would be observed as a shadow from the vehicle's perspective.

Balan reached the following conclusions:

Conclusion No. 1: The amount of lighting at the intersection was significantly below the required levels. With one of the street[]lights not in operation, this condition was exasperated. This lack of lighting at the intersection caused a significant decrease in the ability to observe obstacles, hazards or objects such as pedestrians within the intersection.

Conclusion No. 2: The overgrown and unmaintained tree branches did not allow the vehicle operator to see the stop sign in the amount of time required to stop the vehicle. The tree interfered with the required sight distances required [by the] New Jersey DOT.

Conclusion No. 3: The only light available at the intersection would back light the pedestrian causing the pedestrian to become a shadow from the perspective of the vehicle operator.

Conclusion No. 4: PSE&G is responsible for the maintenance of the street[]lights along the roadways and intersection. They were not maintained properly after multiple requests to be placed back in operation.

In preparation of the December report, Balan reviewed various depositions and exhibits. He stated:

17

Based on the review of above-mentioned additional documents, they confirm the area of incident being quite dark, streetlight closest to the location of incident not being functional, and tree branches being overgrown and obstructing the stop sign. Especially since the area was designated as "Dangerous Intersection", [Lodi] should have been more proactive in doing a better job with their maintenance obligations regarding street lighting and tree trimming to provide a safer environment for the residents.

Since [Lodi] was familiar with their agreement with PSE&G and the limitations in getting full engineering support on lighting related tasks, L[odi] should have involved a qualified engineering firm, to act as the Borough Engineer, for their lighting design to ensure calculations, layout, specifications for type of lighting system, and any other specific requirements are getting designed in accordance with local, state, and federal codes and common approaches.

After reciting from the PSE&G Tariff, Balan stated:

Knowing that PSE&G has never been provided with engineered set of plans that would show locations, spacing, pole height, type of luminaire, wattage, voltage, and other related engineering data for anywhere within . . . [Lodi], PSE&G could have [been] more proactive in making recommendations to . . . [Lodi] to make improvement to the existing lighting systems present along Prospect Street. Although PSE&G did not have adequate staffing to drive at night to determine any potential inadequacies in light levels and other maintenance relate[d] issues, knowing the performance of their own lighting systems, seeing "Dangerous Intersection" signs, and tall trees that would obscure and block light levels on car driven

18

surfaces, they should have at least made recommendations to . . . [Lodi].

In Balan's January report, he referenced plaintiff's investigator's report and noted "Bavagnoli recall[ed] reporting issues regarding the nearby light to PSE&G several times as the light kept going out." He also noted Bavagnoli "further state[d] that the light was a problem for years and not being functional for [a] majority of times and having on-going issues for several years." However, Bavagnoli's deposition was not included in the additional materials reviewed.

Balan stated:

> [I]t is uncertain if the light was truly operational at the time of the accident or not.
>
> The video[4] also shows the area of incident being quite dark. Aside from the uncertainty with the operation of the streetlight, and lack of adequate lighting to begin with, overgrown tree branches are also evident from this video. This issue contributes to the obstruction of the stop sign. Even if the streetlight was functioning at the time of the accident, the overgrown tree branches clearly show reduced illumination levels at the street level where the accident occurred and within the intersection.
>
> Another contributing fact is that even if the streetlight was working at the time of the accident, the trees were blocking the light levels so much that only light

---

4 Dashcam video from the police cruiser on the night of the accident.

A-1189-23

available at the intersection on the northwest corner would back light the pedestrian causing the pedestrian to become a shadow from the perspective of the vehicle operator, adding more darkness to an already dark area.

In Balan's deposition he testified that he "serve[d] on the IESNA board." Further, he had "been a member since . . . 2000." In addition, he was "on the board of managers . . . [and was] the treasurer for the local chapter . . . for many . . . years."

The following exchange occurred during Balan's deposition:

Q. . . . Let's talk about [the] IESNA for a moment. You are a member of that, sir?

A. Yes, I am.

Q. Do you know what IESNA 2000 is, sir?

A. Yeah, it is the handbook guideline recommendations that was published by IESNA in 2000.

Q. Okay. Is it your understanding . . . that IESNA 2000 applies to lighting that is in place or lighting that is to be put in place or constructed.

A. Yeah, this would be for lighting that is going to be either designed as new or if you are to modify and upgrade lighting then you would follow those guidelines.

Q. Right. So [the] IESNA 2000 standard that you cite do[es] not apply to existing lighting systems, correct.

20

A. That particular version of the handbook does not.

Q. Okay. So what you've cited in your expert report does not apply to the Lodi lights at issue because they are already existing, correct?

A. Right, not that particular version, yes.

Q. Well, you haven't cited any other version, correct?

A. Correct, correct.

Q. So your citing of IESNA 2000 in your expert report is inapplicable to the Lodi system at issue, correct?

A. Yeah, that was basically just a reference from the lighting illumination standpoint and reference to a guideline that again was applicable at the time that the report was written.

Q. But it was inapplicable to . . . Lodi's existing system, correct?

A. That's correct, unless I find out –

Q. If the town wanted to put a new system in, then those guidelines could be applicable, correct?

A. Correct.

Q. Okay. And that is not what happened in this case, right?

A. No, unless I know like what year that was built and . . . that is what I do, I track down the guidelines that would be applicable at the time of install.

Q. Were these lights installed in 2000, sir?

21

A-1189-23

A. I don't think so but I don't know.

Q. So if it can be proven that these lights went up before the year 2000, then your reference to IESNA in your report is inapplicable, correct?

A. That is correct.

Further, as to the trees being overgrown, Balan acknowledged he had no standard for what "overgrown" meant, and testified it was just his "opinion when [he] s[aw the] trees."

As to PSE&G, Balan acknowledged that he only relied on the Tariff to establish a standard of care for PSE&G. Moreover, he acknowledged PSE&G's responsibilities under the Tariff and testified that "the [T]ariff d[id]n't require [PSE&G] to be proactive."

On October 13, 2023, the trial court heard plaintiff's and PSE&G's arguments on PSE&G's motion for summary judgment. PSE&G contended: (1) "there [wa]s no statute or regulation that impose[d] a duty upon [it to] provide[] lighting for the streets of" Lodi; (2) if "notice" to PSE&G created a duty, "plaintiff failed to demonstrate any competent evidence that the light had been reported as out or non-functional prior to the accident"; and (3) "there[ wa]s no competent evidence to demonstrate the light was out at the time of the event."

22

In an oral opinion, the trial court found PSE&G had no duty to "provide[] lighting for the streets of the Borough." The court noted PSE&G's reliance on Sinclair v. Dunnigan, 905 F. Supp. 208, 214 (D.N.J. 1995), for the proposition that "there is no statute or regulation that imposes a duty upon [PSE&G to] provide[] lighting for" Lodi.

As to notice and operability, the trial court found: (1) "multiple members of the Sanchez family lived in close proximity to the location [of the intersection] but . . . testified that they never reported the subject streetlight being out" and (2) plaintiff's "heav[]y and exclusive[]" reliance on Bavagnoli was unavailing because "[b]y [plaintiff's] own admission, [Bavagnoli] d[id] not know when he made the call. [Bavagnoli wa]s certain he made one call. That call is corroborated by the records of P[SE&G] being made after the accident."

As to plaintiff's alternative theory, that PSE&G was "required to advise [Lodi] with regard to light design and placement" or "provide streetlights with sufficient illumination for crosswalks," the trial court found no "statute, rule, or case law that require[d] a public utility . . . to undertake" those responsibilities, relying on the Tariff. Based on the Tariff, the trial court concluded PSE&G did not set the requirements for illumination at intersections. The court noted

23

plaintiff's experts agreed with this conclusion. The court granted PSE&G summary judgment.

Next, the trial court considered Lodi's motion for summary judgment. Lodi argued: (1) there was no evidence the incident even took place in the crosswalk; and (2) plaintiff could not satisfy the New Jersey Tort Claims Act (TCA)[5] because: (i) there was no dangerous condition, (ii) it had no notice of "a potentially dangerous lighting condition," (iii) its actions were not palpably unreasonable, and (iv) there was no causation. Lodi also filed a motion to bar plaintiff's experts. The court requested additional briefs regarding whether the experts offered "net opinions."

Plaintiff filed a motion for reconsideration regarding the grant of summary judgment to PSE&G. On November 16, 2023, the trial court heard the parties' arguments concerning plaintiff's motion for reconsideration. In an oral opinion, the court denied reconsideration, finding the motion did not "raise anything different or new or anything [the court] did[ no]t consider." For clarity, the court stated PSE&G had "neither [actual] notice nor constructive notice." In addition, the court stated PSE&G did not set the requirements for illumination at the intersection.

---

[5] N.J.S.A. 59:1-1 to – 12-3.

The trial court also considered plaintiff's and Lodi's arguments regarding the "net opinion rule." Lodi argued plaintiff's experts' opinions must be barred under the rule. As to plaintiff's expert, Smith, Lodi argued he was "not an accident reconstructionist" and therefore could not offer an opinion "as to where the accident happened, because he did no[t conduct] an investigation." Instead, Smith "base[d his opinion] upon . . . his conversations with . . . plaintiff," who "had no recollection of the night."

Further, Lodi objected to Smith's report because it was "based upon the" IPMC which was "completely inapplicable . . . to public roadways, within . . . Lodi."

In addition, Lodi argued Balan's opinion must be barred because he was also "not an accident reconstruction expert," "never actually spoke with . . . plaintiff to see how the accident happened," "never visited the scene," and "never conducted any kind of investigation."

Further, Lodi contended Balan relied upon the IESNA "standard, which . . . ha[d] absolutely no bearing . . . or no authority over roadways within" Lodi.

On December 14, 2023, the trial court issued an oral opinion. The court explained that "plaintiff present[ed] an argument that . . . multiple series of

negligent acts combined to cause an impermissible back lighting condition, which . . . obscured . . . Marino's view of . . . plaintiff[,] causing a collision."

As to Smith, the trial court considered Smith's admission that the IPMC "d[id] not address nor consider street lighting, and/or the adequacy of same." Further, the court considered that Smith was not "an accident reconstruction[ist] . . . nor . . . an expert in lighting." "As to his expertise on the issue of back lighting, . . . Smith ha[d] never rendered an opinion o[n] back lighting, and ha[d] only read up on the issue."

In addition, the trial court noted Smith's opinion "relie[d] upon a conclusion that . . . [Lodi] had notice of both inoperability [and] the street[]light's insufficient illumination." However, the court found Lodi had neither "actual notice" nor "constructive notice of [the] inoperability of the street[]light." Further, the court found Smith's opinion that Lodi "had a responsibility to . . . check on the functionality of the street[]lights" lacked a basis in a "standard code of customary practice."

Further, the trial court noted Smith "determined the stop sign was hidden" however, the court—while accepting the determination as true—also noted Marino "was . . . aware of the physical characteristics of the intersection, and . . . the presence of the stop sign."

26

As to Balan, the trial court considered his admission that the IESNA was "not intended to be applied to existing lighting systems, until such systems [we]re completely redesigned." Further, the court considered Balan "never visited the accident scene before rendering his opinion. Never talked to . . . plaintiff. And relied on photos in forming his opinions, that . . . did not demonstrate the issue of back lighting."

The trial court found that "[a]lthough both . . . plaintiff's experts [went] to great lengths to find the actions of . . . Lodi palpably unreasonable for failure to provide adequate illumination, neither expert provides any standard[,] . . . statutes or regulations, placing such a duty upon" Lodi. The court found "plaintiff's experts reports f[e]ll short" and granted Lodi summary judgment.

On appeal, plaintiff asserts the trial court erred in granting PSE&G summary judgment because PSE&G had a duty: (1) "not to install ineffective lighting"; (2) "to provide adequate lighting"; (3) to provide "pedestrians . . . streetlights with sufficient illumination for a crosswalk"; (4) of "proper inspection" and "reasonable inspection"; and (5) under the Tariff "to recommend 'appropriate [lighting] option[s] based on the customer's needs.'"

Further, plaintiff argues PSE&G "is not immune from liability to plaintiff for contributing to the installation of defective lighting" and "cannot escape

27

liability [by] hiding behind the Tariff," because, under the common law, the Supreme Court abrogated a water company's immunity in Weinberg v. Dinger, 106 N.J. 469 (1987), and we should similarly do so here.

Plaintiff states "a property owner will be liable for a dangerous condition that caused injury when it had actual or constructive notice of said condition," citing Jeter v. Sam's Club, 250 N.J. 240, 251. Plaintiff contends "PSE&G had actual notice of the hazard existing in the intersection . . . [because] it installed the . . . lamp which gave rise to the backlight condition." Moreover, PSE&G had constructive notice of the "hazard" because "its employees worked all the time all over Lodi and on Prospect Street [and had] to have noticed the . . . feeble . . . lighting . . . and the streetlight being more off than on over the years." Lastly, plaintiff argues Bavagnoli's "confused" testimony "about the timing of [his] call" should be a jury question.

Plaintiff also contends the trial court erred in granting Lodi summary judgment. Plaintiff argues that summary judgment was improper because: (1) Lodi's conduct was "palpably unreasonable" under N.J.S.A. 59:4-2; and (2) he was not required to prove Lodi had "notice" of the hazard because Lodi created the condition, N.J.S.A. 59:4-3.

Plaintiff argues that Lodi's "streetlight purchase process" was palpably unreasonable because:

> Key Lodi officials, who worked for . . . [Lodi] for decades, had no knowledge about the . . . process. Moreover, these officials failed to retain proper engineering expertise to ensure that competent guidance was obtained from PSE&G about the suitability of street lighting near an intersection that Lodi deemed a dangerous intersection. The engineer retained by Lodi for various services in the Borough testified that he was never called upon to provide any lighting service to Lodi.

Further, although plaintiff argues he need not prove notice, he adds Lodi "had constructive notice of the hazard since it had existed for a very long time." Indeed, plaintiff contends "[b]oth the [Lodi a]dministrator and the [p]ublic [w]orks [d]irector had decades to uncover that street lighting was not adequate in the intersection . . . [Lodi] itself designated a dangerous intersection."

Finally, plaintiff and Lodi disagree as to the import of the trial court's opinion regarding plaintiff's experts. Plaintiff argues "[t]he trial court erred in barring the testimony of [his] liability experts" because "[t]he opinions offered by . . . Smith . . . and . . . Balan . . . do not constitute 'net opinions.'" Instead, plaintiff contends the experts are qualified under N.J.R.E. 702 and could "assist the trier of fact," and the opinions have the proper foundation under N.J.R.E. 703.

29

In response, Lodi asserts "the [m]otion to [b]ar [plaintiff's experts] was rendered moot by [the trial court]'s careful and considered analysis of the evidence in the case and the [m]otion to [b]ar was, in fact, withdrawn." Lodi states the trial court "found that [p]laintiff's experts' opinion contained insufficient proofs to support the necessary analysis of whether a dangerous condition existed and whether . . . Lodi's conduct was palpably unreasonable."

Because we conclude the trial court's opinion barred plaintiff's experts' opinions and that analysis provided additional support to grant summary judgment, we consider whether the experts authored inadmissible "net opinions."

## II.

We review the grant of summary judgment de novo, applying the same legal standards as the trial court. Green v. Monmouth Univ., 237 N.J. 516, 529 (2019).

> The judgment or order sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party,

> would require submission of the issue to the trier of fact.
>
> [R. 4:46-2(c).]

"The factual findings of a trial court are reviewed with substantial deference on appeal, and are not overturned if they are supported by 'adequate, substantial and credible evidence.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014) (quoting Pheasant Bridge Corp. v. Twp. of Warren, 169 N.J. 282, 293 (2001)).

"If there is no genuine issue of material fact, we must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007), overruled on other grounds by Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 563 (2012)). We review issues of law de novo and accord no deference to the trial judge's conclusions of law. See Nicholas v. Mynster, 213 N.J. 463, 478 (2013). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

A-1189-23

## A.

Plaintiff's claims against PSE&G are grounded in negligence. "To prevail on a claim of negligence, a plaintiff must establish four elements: (1) that the defendant owed a duty of care; (2) that the defendant breached that duty; (3) actual and proximate causation; and (4) damages."[6] Fernandes v. DAR Dev. Corp., 222 N.J. 390, 403-04 (2015).

Plaintiff argues PSE&G had a duty to: (1) "install" and "provide" "adequate" and "effective" lighting; (2) "recommend appropriate" lighting based on Lodi's needs under the Tariff; and (3) provide "proper" and "reasonable inspection[s]."

"In most negligence cases, the plaintiff is not required to establish the applicable standard of care." Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014). Ordinarily, "[i]t is sufficient for [the] plaintiff to show what the defendant did and what the circumstances were. The applicable standard of conduct is then supplied by the jury[,] which is competent to determine what precautions a reasonably prudent [person] in the position of the defendant would have taken." Id. at 406-07 (alterations in original) (quoting Sanzari v.

---

[6] For purposes of the motion, Sanchez's allegation that he was damaged was not contested.

Rosenfeld, 34 N.J. 128, 134 (1961)). "Such cases involve facts about which 'a layperson's common knowledge is sufficient to permit a jury to find that the duty of care has been breached without the aid of an expert's opinion.'" Id. at 407 (quoting Giantonnio v. Taccard, 291 N.J. Super. 31, 43 (App. Div. 1996)).

However, there are cases when "the 'jury is not competent to supply the standard by which to measure the defendant's conduct,'" "and the plaintiff must instead 'establish the requisite standard of care and [the defendant's] deviation from that standard' by 'present[ing] reliable expert testimony on the subject,'" ibid. (alterations in original) (first quoting Sanzari, 34 N.J. at 134-35; and then quoting Giantonnio, 291 N.J. Super. at 42). Otherwise, the jury is left to speculate. See ibid.

There is no dispute that here, plaintiff is required to proffer an expert's opinion regarding proper lighting. The fields of illumination and lighting of streets and roadways "concern[] . . . subject matter[s] that [are] . . . beyond the ken of the average juror." Jacobs v. Jersey Cent. Power & Light Co., 452 N.J. Super. 494, 504 (App. Div. 2017) (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 413 (1992)).

A "deferential approach [is given] to a trial court's decision to admit expert testimony, reviewing it against an abuse of discretion standard." Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011).

N.J.R.E. 702 provides "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

Also, Rule 703 states "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the proceeding."

"Qualified expert testimony is admissible to assist the jury, N.J.R.E. 702, but there must be a factual and scientific basis for an expert's opinion." Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div. 1996). Thus, "[a]n opinion lacking in foundation is worthless." Ibid. Therefore, "[w]hen an expert's opinion is merely a bare conclusion . . . i.e., a 'net opinion,' it is inadmissible." Ibid. "In essence, the net opinion rule requires the expert witness to give the why and wherefore of his expert opinion, not just a mere conclusion." Ibid. "Where, . . . an expert offers an opinion without providing specific

underlying reasons . . . he [or she] ceases to be an aid to the trier of fact and becomes nothing more than an additional juror." Ibid.

Smith's opinion relies on the IPMC, which, by its very terms, does not apply to illumination and lighting of streets and roadways. Indeed, during his deposition, Smith acknowledged the IPMC had "no direct" application to Lodi or "lighting conditions on public roads."

Further, Smith's and Balan's opinions relied on the IESNA 2000. However, Balan admitted the IESNA 2000 applied to "lighting that is going to be either designed as new or if you are to modify and upgrade lighting systems." Balan acknowledged that the IESNA 2000 version was inapplicable to Lodi's existing system.

Moreover, Smith testified that he could not say PSE&G violated the Tariff. While he thought there were other "governing principles," he failed to state them. Moreover, Balan stated he used PSE&G's Tariff to establish PSE&G's duty to be more "proactive," but testified that "the [T]ariff d[id]n't require [PSE&G] to be proactive."

In addition, Smith stated "PSE&G had been advised by local residents of the malfunctioning streetlight." Balan stated "multiple requests" were made to PSE&G to put the streetlights "back in operation," and he noted "Bavagnoli

recall[ed] reporting issues . . . several times."  However, these facts are not supported in the record.  The only witness, regarding notice to PSE&G, was Bavagnoli and he confirmed he called once after the accident.

Also, Smith stated "Marino admitted [in his deposition] that he was not aware of the stop sign at the incident intersection."  However, Marino consistently said he was familiar with the intersection and the stop sign.

Therefore, we conclude Smith's and Balan's expert opinions are "net opinions" as to duty and breach because the opinions lack foundation and rely on facts that were not supported in the record.  We conclude the trial court's decision to bar plaintiff's experts' opinions was not an abuse of discretion.  Therefore, plaintiff's claims fail because he cannot establish duty or breach.

Nonetheless, we address causation for completeness.  "[W]hile causation is generally a question of fact, 'the question becomes an issue of law when there is no evidence from which a jury could reasonably find the required proximate, causal nexus between the careless act and the resulting injuries.'"  Arthur Anderson LLP v. Federal Ins. Co., 416 N.J. Super. 334, 348 (App. Div. 2010) (quoting Port Auth. v. Arcadian Corp., 189 F.3d 305, 318-19 (3d. Cir. 1999)).

The underlying premise of plaintiff's theory of liability is that PSE&G's failures concerning the lighting of the intersection resulted in Marino's inability to see Sanchez causing Marino to strike him in the crosswalk.

However, Marino, a sixty-three-year resident of Lodi, consistently stated he was familiar with the roadway and the stop sign. In fact, in Marino's statement, he indicated he was slowing down as he approached the intersection because of the stop sign. Under these circumstances, and even assuming below standard lighting of the intersection, the lighting was of no moment because Marino was aware of his obligation to stop and was complying.[7] Based on these uncontested facts, plaintiff cannot establish causation as a matter of law. See Arthur Anderson LLP, 416 N.J. Super. at 348.

Therefore, we conclude plaintiff's proffered experts' opinions are barred as "net opinions," and thus he cannot establish duty or breach. Further, because lighting was immaterial to Marino's knowledge of his obligation to stop—he was familiar with the roadway, the stop sign, and was stopping before the crosswalk—plaintiff cannot establish causation. Thus, summary judgment was properly granted to PSE&G.

---

[7] See N.J.S.A. 39:4-144(a).

B.

For plaintiff to maintain a claim against Lodi, a "public entity,"[8] he

> must establish the existence of a "dangerous condition,"
> that the condition proximately caused the injury, that it
> "created a reasonably foreseeable risk of the kind of
> injury which was incurred," that either the dangerous
> condition was caused by a negligent employee or the
> entity knew about the condition, and that the entity's
> conduct was "palpably unreasonable."
>
> [Stewart v. N.J. Tpk. Auth./Garden State Parkway, 249
> N.J. 642, 656 (2022) (quoting Vincitore v. N.J. Sports
> & Exposition Auth., 169 N.J. 119, 125 (2001) (quoting
> N.J.S.A. 59:4-2)).]

The statutory "elements are 'accretive; if one or more of the elements is not satisfied, a plaintiff's claim against a public entity alleging that such entity is liable due to the condition of public property must fail.'" Ibid. (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 585 (2008)).

Under N.J.S.A. 59:4-1(a), a "'[d]angerous condition' means a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." As we explained above, plaintiff is required to proffer an expert opinion that the

---

[8] N.J.S.A. 59:1-3.

lighting created a "dangerous condition" in the intersection. Plaintiff failed in this respect because his experts' opinions were inadmissible "net opinions."

Moreover, plaintiff's contention that Lodi was responsible for tree limbs, that obstructed the lighting of the stop sign or the stop sign itself, is unavailing because Marino testified he was aware of the stop sign and was slowing down as he approached the intersection. Therefore, any obstruction caused by the tree limbs was of no moment considering Marino was aware of the sign and was adhering to it. Based on these unrefuted facts, plaintiff cannot establish causation as a matter of law. See Arthur Anderson LLP, 416 N.J. Super. at 348. The court properly granted Lodi summary judgment.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1189-23